101 N.J. Super. 470 (1968)
244 A.2d 693
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
ELIJAH COX, JR., DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued May 20, 1968.
Decided June 24, 1968.
*472 Before Judges CONFORD, COLLESTER and LABRECQUE.
Miss Cynthia M. Jacob, Assistant Deputy Public Defender, argued the cause for appellant (Mr. Peter Murray, Public Defender, attorney).
Mr. John Harrison, Assistant Prosecutor, argued the cause for respondent (Mr. Martin J. Queenan, Burlington County Prosecutor, attorney; Mr. Myron H. Gottlieb, on the brief).
The opinion of the court was delivered by LABRECQUE, J.A.D.
Defendant Elijah Cox, Jr. appeals from his conviction under indictments for conspiracy to commit robbery, N.J.S. 2A:98-1; armed robbery, N.J.S. 2A:141-1 and 151-5; kidnapping, N.J.S. 2A: 118-1; assault and battery upon a police officer, N.J.S. 2A:90-4, and larceny of an automobile, N.J.S. 2A:119-2. James Hickman and Alfred Cooper were jointly indicted with him but separately tried.
*473 On the armed robbery indictment defendant was sentenced to a term of from 16 to 25 years in State Prison. He was sentenced to concurrent terms of from one to three years for conspiracy, five to seven years for assault and battery upon a police officer and five to seven years for larceny, and to a term of from 30 to 40 years for kidnapping, to run consecutively with the prior sentences.
The indictments arose out of a train of events which began with the holdup of a service station in Cinnaminson Township on September 28, 1966. On the evening of that day, as the service station attendant was preparing to close for the night, he was held up at gunpoint by two men who relieved him of $5 and forced him to open the cash register from which they abstracted $100. Their movements aroused the suspicions of Sergeant William Peters of the Cinnaminson police who was passing by, and he drove in and stopped by the gas pumps. The holdup men, not realizing that it was a police officer, at first told the attendant to go out and wait on the customer. With this he ran out, shouting, and ducked behind a car, whereupon the two holdup men ran out towards the rear of the building. As Peters followed, the two men were joined by another as they made for a 1961 Ford (later identified as belonging to Cox) which was parked there. There was an exchange of gunfire, Peters' first shot hitting and dropping one of the men as he stood by the front door of the Ford preparatory to getting into the front seat. His second shot broke a rear window and his third shot struck one of the men who was in the rear. As Peters came close, the wounded man on the ground passed something to the wounded man in the rear seat, who thereupon opened fire shattering Peters' right arm. Peters returned the fire but was in turn shot in the neck, shoulder and head and finally collapsed. As a result, he lost the sight of his left eye, had only partial use of his right arm and faced the prospect (a 90% chance) that he would have to undergo another operation on his arm.
*474 In the meantime, a Mrs. Evelyn Paulson, driving by in her 1964 Chevrolet, had observed the wounded officer and, thinking it was an accident, stopped. With this the three men came over to her car and one of them, upon being refused entrance, broke a window vent with a metal object and opened the door. One of them then pushed her to the side and got behind the wheel while the other two got into the rear. They drove the car to Camden where it was abandoned after they had relieved her of $8, tied her hands with a plastic rain hat, gagged her with a handkerchief and told her to lie down in the back seat on pain of death. She later freed herself and told her story to the police.
The fact that the car abandoned at the service station was registered and licensed in the name of Cox led to a search of his apartment. The search yielded a coat and undergarments which contained what appeared, and were later testified, to be blood stains and bullet holes. Glass found in a pocket of defendant's sport coat was matched to that in the window of Cox's car, and a spent bullet found in another pocket of the same coat bore indications that it had been discharged from Peters' service revolver.
Subsequent to the holdup Cox borrowed a friend's car, presumably to move some boxes. It was not returned and was subsequently found, abandoned, in Washington, D.C. Cox was not located until nine months later, when he was picked up in Detroit under an alias. At that time he bore scars from bullet wounds on his neck, stomach and hip. In a statement given there he denied that he had actually participated in the attempted holdup but stated that he had waited in the car while Hickman and Cooper got out, presumably to get whisky. In the statement he denied possessing a gun and asserted that it was Hickman and Cooper who had stopped Mrs. Paulson. At the trial Peters identified Cox as one of the men he had seen enter the gas station on the night of the holdup and as the one who had first fired at him from the rear of the car.
Defendant did not take the stand. His wife testified, over objection, that Hickman had told her that he (Hickman) *475 had shot Peters and Cox "didn't know nothing what was going on."
By his first point defendant challenges the sentences as manifestly excessive. In substance, he argues that the indictments against him involved but one episode, the robbery, and that the sentences imposed by virtue thereof should have been made concurrent rather than consecutive. More specifically, he contends that since the kidnapping was merely part of the "getaway" following the robbery, the imposition of consecutive sentences was a clear abuse of discretion.
The rule is well settled that the quantum of the sentence imposed, if within the limits fixed by law, is a matter within the discretion of the sentencing judge. While such exercise of discretion on the part of the trial judge is reviewable on appeal, and, if found to be a mistaken exercise thereof, may be corrected (by way of revision or remand for resentencing), State v. Johnson, 67 N.J. Super. 414, 432, 170 A.2d 830 (App. Div. 1961), the power of the court to do so should be exercised with extreme care and only in cases where the sentence is clearly found to be unduly punitive. State v. Gibbs, 79 N.J. Super. 315, 325, 191 A.2d 495 (App. Div. 1963). In determining whether the sentences violated that standard we must consider them in the light of the total circumstances. The burden of establishing that they were excessive rests on the defendant and requires a showing that there was an abuse of the judge's judicial prerogative. Ibid.
Here we are unable to agree with defendant's contention that the five offenses of which he was found guilty comprised a single continuous transaction. On the contrary, they involved (1) the planning and perpetration of the robbery, (2) the wanton maiming of the officer in order to prevent pursuit and apprehension, and (3) the larceny of her car and kidnapping of Mrs. Paulson in order to facilitate their flight (after Cox's car apparently failed to start). These represent a sequence of separate events, deliberately undertaken in succession, rather than a single episode. It can hardly be contended that when the robbery was planned it *476 was anticipated that Officer Peters would intervene and conduct such a vigorous pursuit that it would be necessary to shoot him. Likewise, as to the breakdown of Cox's car and the consequent necessity for another means of escape.
While the punishments imposed were severe, we cannot say that they were the result of a mistaken exercise of discretion on the part of the sentencing judge. The sentences for conspiracy, for armed robbery, for assault and battery upon a police officer and for larceny, were well within the maximum limits fixed by law and were made concurrent with one another. That for kidnapping carried with it a mandatory sentence of at least 30 years. Out of an abundance of caution we requested and have been provided with the presentence report which was before the court at the time of defendant's sentencing. We find nothing therein which supports defendant's present contention and much which supports the sentences imposed. Cox, who was 32 years of age at the time of his sentencing, had been in difficulty with the law since he was 11 years of age. He served sentences in the State Home for Boys at Jamesburg in 1948 and 1950; in the Federal Reformatory at Chillicothe, Ohio, in 1952 and in Bordentown Reformatory in 1958 and 1961. Prior to his return to this State from Detroit, he had pleaded guilty there to breaking and entering.
Defendant next urges that the failure, upon motion, to provide him with a transcript of the separate trial of Hickman, his codefendant, amounted to a denial of due process and equal protection of the law. Hickman had been tried in January 1967, two months before defendant was apprehended and brought back to this State. Two months thereafter his counsel moved that defendant be furnished, as an indigent, with a copy of the stenographic record of Hickman's trial. At that time no transcript had been made up and defendant's counsel was unable to state, in response to the court's request, just how the transcript would aid him in preparing for trial. The motion was denied but the court stated:
*477 "[I]f you could satisfy me by any tangible evidence that the transcript is necessary, if you could point to something which would indicate to me that it will be helpful to him, then I am inclined to agree with you that being a poor man, not being able to afford it, he ought to have it; but to merely say, `maybe if I see it it will help me prepare my case; maybe, if there is something in this that I can find that it will help my case,' it is all based upon hope, expectation.
I think in an application of this type you must convince the Court that you are driving at something which appears thereon which will materially aid your client, and your client is an indigent and unable to pay for it. But, just to say that you hope, you think, you believe that maybe it might give you something, I don't think that this is a good basis for a transcript. You see?"
The court suggested that counsel go over the stenographic notes of the trial with the reporter and:
"If you were to present to this Court some facts, that you have talked with the Court Stenographer, you have had him read over to you certain portions of that stenographic transcript which was untyped, of course, from his notes, and you have noticed therein a discrepancy between what your investigation has shown of other facts in the case and that transcript, then you would be giving me something which would indicate that I ought to oblige, I ought to cooperate, I ought to give this man that transcript because he is indigent."
And further:
"[I]f you were to find some discrepancy some where along the line which you could present to me today which would indicate that a transcript might be helpful to this defendant, believe me, I would not hesitate a minute to let him have it. But I don't think on mere speculation I can do that, Mr. Brown. I don't think I should do it."
The motion was renewed at trial on the same grounds and with the same result.
In essence, the issue presented is whether, in the absence of a showing of specific need for the transcript of Hickman's trial, the court's denial thereof deprived defendant of his aforementioned constitutional rights.
In Griffin v. State of Illinois, 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891 (1956) it was held that the refusal of a free transcript of his trial to an indigent defendant for use *478 on his appeal was a denial of equal protection. It was conceded that such a transcript was a prerequisite to adequate appellate review and the court reasoned: "Destitute defendants must be afforded as adequate appellate review as defendants who have money enough to buy transcripts." (351 U.S., at p. 19, 76 S.Ct., at p. 591). In Draper v. Washington, 372 U.S. 487, 83 S.Ct. 774, 9 L.Ed.2d 899 (1963), also involving an application for a transcript to be used on an appeal from a criminal conviction, it was held that an indigent defendant might not be denied a free transcript upon a finding by the trial judge that his appeal was frivolous and his guilt established by overwhelming evidence. The same rule was applied to appellate review of certain additional proceedings in Lane v. Brown, 372 U.S. 477, 83 S.Ct. 768, 9 L.Ed.2d 892 (1963) (appeal from denial of coram nobis relief); Long v. District Court of Iowa, 385 U.S. 192, 87 S.Ct. 362, 17 L.Ed.2d 290 (1966) (appeal from denial of relief on habeas corpus).
In Roberts v. LaVallee, 389 U.S. 40, 88 S.Ct. 194, 19 L.Ed.2d 41 (1967), on the basis of a New York statute requiring payment of certain fees for a transcript of the testimony of a prisoner's preliminary hearing, it was held, following Griffin and Draper, that refusal of a free transcript of such hearing to an indigent prisoner amounted to denial of equal protection. The transcript in question contained the testimony of the major state witnesses against defendant and was presumably required for the purpose of preparing his defense. To the same effect are People v. Montgomery, 18 N.Y.2d 993, 278 N.Y.S.2d 226, 224 N.E.2d 730 (Ct. App. 1966) and State ex rel. Marshall v. Eighth Judicial District Court, 80 Nev. 478, 396 P.2d 680 (Sup. Ct. 1964) (where new counsel on defendant's second trial was held entitled to a transcript of his first trial (which ended in a disagreement) for use "for information, preparation, and for possible impeachment" at the retrial). Accord, Peterson v. United States, 351 F.2d 606 (9 Cir. 1965); but compare Williams v. United States, 358 F.2d 325 (9 Cir. 1966).
*479 Our attention has not been called to any case in which the doctrine of Griffin has been extended, without a showing of need, to a transcript of the separate trial of an indigent defendant's codefendant. While such appears to have been the ruling in Beasley v. State, 81 Nev. 431, 404 P.2d 911 (Sup. Ct. 1965), a reading of the opinion would seem to indicate that the real issue there was whether it was error to compel defendant to go to trial in advance of receipt of a free transcript of the separate trial of his codefendants which another judge had ordered to be furnished to him.
In the context of the undisputed facts before us, we hold that denial of defendant's motion for a transcript was not violative of his constitutional rights to due process or equal protection.
In Griffin v. Illinois the court noted that Illinois was not required to purchase a stenographic transcript in every case where a defendant could not buy it. 351 U.S., at p. 20, 76 S.Ct. 585, 100 L.Ed. 891. And in Draper v. Washington it was pointed out that alternative methods could be utilized for the purpose of adequately placing before the appellate court an equivalent report of the events upon which appellant's contentions on appeal were based. 372 U.S., at p. 495, 83 S.Ct. 774. In the event that such alternate methods were not available or were inadequate, only such portion of the transcript as was germane to consideration of defendant's appeal was required to be furnished gratis, the court commenting that "the fact that an appellant with funds may choose to waste his money by unnecessarily including in the record all of the transcript does not mean that the State must waste its funds by providing what is unnecessary for adequate appellate review." Ibid., at p. 496, 83 S.Ct., at p. 496. The cited rationale would seem to be no less applicable to the facts before us. At the most, defendant was constitutionally entitled only to such portions of the transcript as he had need for.
Here the application was for a record which had not yet been transcribed. The issue was what portions thereof, if any, should be transcribed and furnished to defendant at the taxpayers' *480 expense. The inference from his response to an inquiry by the court was that defendant's counsel had already had access to statements of the State's witnesses. He had been allowed the expense of a private investigator and the prosecution had been specifically directed to cooperate with him in the matter of preparing for trial. In substance, the purpose of the request for the transcript, so far as was revealed to the court, was to uncover such discrepancies in the testimony of the State's witnesses as might be found to be present. Defendant knew of no such discrepancies and gave no reason for any reasonable belief that they existed. He was therefore afforded the opportunity of going over with the court reporter the latter's notes of the trial with the view to determining what portions thereof might demonstrate some need for parts of the transcript. Although counsel indicated at the time that he would follow the court's suggestion, the record does not disclose whether he did so. The absence of any reference to it when the motion was renewed at trial convinces us that he did not, or that if he did, his quest was unsuccessful.
We are satisfied that the rulings of the trial judge afforded defendant an adequate alternative to the use of the trial transcript for the purpose expressed by his counsel and that, in any event, they did not entail any deprivation of defendant's rights under the Fifth or Fourteenth Amendments.
We have reviewed the remaining points raised and find them to be without merit. Specifically, we are satisfied that the denial of defendant's motion for a change of venue did not amount to a mistaken exercise of the judge's discretion. State v. Ravenell, 43 N.J. 171, 203 A.2d 13 (1964), certiorari denied Ravenell v. New Jersey, 379 U.S. 982, 85 S.Ct. 690, 13 L.Ed.2d 573 (1965). He was in a better position than we to judge whether an impartial jury could be secured from among the citizens of the county. See Irwin v. Dowd, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961). Nor was it an abuse of the court's discretion to fail to have re-read to the jury all of Officer Peters' testimony in response *481 to the jury's request, when the jury thereafter indicated that it had heard enough. Cf. State v. Wolf, 44 N.J. 176, 185, 207 A.2d 670 (1965). Wholly aside, we fail to perceive how defendant could have been prejudiced by the omission to read the entire testimony.
Defendant's motions for judgments of acquittal were properly denied. His indictments for both conspiracy to commit robbery and for the subsequent robbery did not constitute double jeopardy. Pinkerton v. United States, 328 U.S. 640, 643, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946).
Affirmed.